UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JASON DOUGLAS VERHULST,

                      Petitioner,

v.

MELINDA BRAHAM,

                      Respondent.

_____/

Case No. 1:22-cv-563

Honorable Robert J. Jonker

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. As part of a preliminary review of the petition under Rule 4 of the Rules Governing § 2254 Cases, United States Magistrate Judge Ray Kent noted that it appeared that Petitioner had failed to timely file his petition. (Op., ECF No. 5.) Magistrate Judge Kent entered an order allowing Petitioner 28 days to show cause why his petition should not be dismissed as untimely. Petitioner responded on August 5, 2022. (ECF No. 8.)

With Petitioner's response in hand, the Court is able to complete the preliminary review required by the rules. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (discussing that a district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as

those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436–37 (6th Cir. 1999). The Court may *sua sponte* dismiss a habeas action as time-barred under 28 U.S.C. § 2244(d). *Day v. McDonough,* 547 U.S. 198, 209 (2006). The Court concludes that the petition is untimely and, therefore, it will be dismissed with prejudice.

## I.      Factual Allegations

Petitioner Jason Douglas Verhulst is incarcerated with the Michigan Department of Corrections at the Richard A. Handlon Correctional Facility (MTU) in Ionia, Ionia County, Michigan. On May 16, 2018, Petitioner pleaded guilty in the Newaygo County Circuit Court to second-degree murder. *People v. Verhulst*, No. 2016-0000011491-FC (Newaygo Cnty. Cir. Ct.), Case Details, https://micourt.courts.michigan.gov/case-search/court/C27~1 (search First Name "Jason," Last Name "Verhulst," select Case ID 2016-0000011491-FC, select "Events") (last visited July 31, 2023). On July 19, 2018, the court sentenced Petitioner to a prison term of 23 to 40 years, *id*., a term negotiated by the parties as part of the plea agreement, (*See* Pet'r's Br., ECF No. 1-1, PageID.12).

Petitioner, with the assistance of counsel, filed an application for leave to appeal the judgment claiming that the sentence imposed was disproportionate. (*See id*., PageID.14.) The Michigan Court of Appeals denied leave to appeal by order entered February 28, 2019. *People v. Verhulst*, No. 347227 (Mich. Ct. App., Feb. 28, 2019), https://www.courts.michigan.gov/c/courts/coa/case/347227 (last visited July 31, 2023). Petitioner did not file an application for leave to appeal that decision to the Michigan Supreme Court. (*See* Pet'r's Br., ECF No. 1-1, PageID.14.)

Petitioner then filed a motion for relief from judgment in the Newaygo County Circuit Court on May 16, 2019. (*See* Pet., ECF No. 1, PageID.3.) Petitioner claimed that his trial counsel

and appellate counsel rendered ineffective assistance. By order entered June 3, 2019, the trial court denied relief. *People v. Verhulst*, No. 351731 (Mich. Ct. App.), Case Information, https://www.courts.michigan.gov/c/courts/coa/case/351731 (last visited July 31, 2023).[1] Petitioner, with the assistance of present counsel, filed an application for leave to appeal that decision to the Michigan Court of Appeals. By order entered April 3, 2020, the court of appeals denied leave to appeal. *Id*. Petitioner, again with the assistance of present counsel, filed an application for leave to appeal to the Michigan Supreme Court. *Id*. That court denied leave by order entered March 17, 2021. *People v. Verhulst*, 955 N.W.2d 478 (Mich. 2021).

On June 17, 2022, Petitioner, with the assistance of counsel, filed his habeas corpus petition. Petitioner contends that his trial counsel was ineffective in failing to explore an involuntary intoxication defense and that appellate counsel was ineffective for failing to raise trial counsel's ineffective assistance.

## II.     Timeliness

### A.     Habeas statute of limitations

Petitioner's application is barred by the one-year statute of limitations provided in 28 U.S.C. § 2244(d)(1), which became effective on April 24, 1996, as part of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). Section 2244(d)(1) provides:

---

[1] Neither the motion nor the trial court's order denying the motion appear in the Case Details for Petitioner's criminal prosecution. But the order denying the motion is reflected in the Case Information for the appeal.

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of

(A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

In most cases, § 2244(d)(1)(A) provides the operative date from which the one-year limitations period is measured. Under that provision, the one-year limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). Petitioner sought leave to appeal the judgment of sentence to the Michigan Court of Appeals. That court denied leave on February 28, 2019. Petitioner did not seek leave to appeal to the Michigan Supreme Court.

Where a petitioner has failed to pursue an avenue of appellate review available to him, the time for seeking review at that level is counted under § 2244(d)(1)(A). *See id.* § 2244(d)(1)(A) (setting forth that the time for filing a petition pursuant to § 2254 runs from "the date on which the judgment became final by the conclusion of direct review *or the expiration of time for seeking such review*" (emphasis added)). However, such a petitioner is not entitled to also count the 90-day period during which he could have filed a petition for certiorari to the United States Supreme

Court. *See Gonzalez v. Thaler*, 565 U.S. 134, 152–53 (2012) (holding that, because the Supreme Court can review only judgments of a state's highest court, where a petitioner fails to seek review in the state's highest court, the judgment becomes final when the petitioner's time for seeking that review expires). Under Michigan law, a party has 56 days in which to apply for leave to appeal to the Michigan Supreme Court. *See* Mich. Ct. R. 7.305(C)(2). Accordingly, Petitioner's conviction became final on Thursday, April 25, 2019. Petitioner had one year from that date in which to file his habeas application. April 25, 2020, however, was a Saturday; so Petitioner had until Monday, April 27, 2020, to file his habeas petition.

Petitioner filed on June 17, 2022. Obviously, Petitioner filed more than one year after the time for direct review expired. Thus, absent tolling, his application is time-barred.

### B.     Statutory tolling

The running of the statute of limitations is tolled when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); *see also Duncan v. Walker*, 533 U.S. 167, 181–82 (2001) (limiting the tolling provision to only State, and not Federal, processes); *Artuz v. Bennett*, 531 U.S. 4, 8 (2000) (defining "properly filed").

Petitioner filed a motion for relief from judgment in the trial court on May 16, 2019. That "application for State post-conviction . . . review" tolled the running of the statute of limitations. The statute of limitations remained tolled from the filing of the application for state post-conviction or other collateral relief until the Michigan Supreme Court denied relief on March 17, 2021. *Lawrence v. Florida*, 549 U.S. 327 (2007). The statute would not have been tolled, however, during the time that Petitioner petitioned for writ of certiorari in the United States Supreme Court or during the time Petitioner might have sought that relief. *Id.* at 332.

Petitioner's period of limitation ran for 21 days—from April 25, 2019, until he filed his motion on May 16, 2019. The period was then tolled from May 16, 2019, until March 17, 2021. The period then ran for 344 days and expired on Thursday, February 24, 2022. Thus, even considering statutory tolling, the petition is almost four months too late.[2]

### C.    Equitable tolling

The one-year limitations period applicable to § 2254 is also subject to equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 645 (2010). A petitioner bears the burden of showing that he is entitled to equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). The doctrine of equitable tolling is to be applied "sparingly." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The Sixth Circuit has echoed that caution in the context of habeas corpus petitions. *See, e.g.*, *Watkins v. Deangelo-Kipp*, 854 F.3d 846, 851 (6th Cir. 2017) ("But we must take care to only apply the equitable tolling doctrine 'sparingly.'"); *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011) ("We have indicated that equitable tolling should be applied 'sparingly[.]'"). A petitioner seeking equitable tolling must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

Petitioner has failed to raise equitable tolling or allege any facts or circumstances that would warrant its application in this case. Petitioner was represented by counsel through his state court appeal and the filing of this petition. But even if the late filing is the product of attorney error, a "garden variety claim of excusable neglect," such as a simple miscalculation of the limitations period, does not warrant equitable tolling. *Holland v. Florida*, 560 U.S. 631, 651

---

[2] The petition is tardy by approximately the 21 days that ran before Petitioner filed his motion for relief from judgment plus the 90-day period for Petitioner to file a petition for writ of certiorari. Even accounting for those periods, however, the petition is still two days late.

(2010); *see also Maples v. Thomas*, 565 U.S. 266, 282 (2012) (citing *Holland*, 560 U.S. at 651–52); *Lawrence*, 549 U.S. at 336 ("Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel." (citation omitted)).

Accordingly, Petitioner is not entitled to equitable tolling of the statute of limitations.

### D.    Actual innocence

Magistrate Judge Kent followed the analytical path outlined above to conclude that it was likely that the petition was untimely. He allowed Petitioner an opportunity to show cause why the petition should not be dismissed for that reason. In Petitioner's response, he does not challenge the above analysis with regard to the date the period of limitation began to run, the dates it was tolled by Petitioner's motion for collateral relief, the date the period began to run again, or the date the period expired. Nor does Petitioner offer any reason to equitably toll the statute. Instead, Petitioner claims that he is actually innocent and, therefore, he is excused from the procedural bar of the statute.

In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Supreme Court held that a habeas petitioner who can show actual innocence under the rigorous standard of *Schlup v. Delo*, 513 U.S. 298 (1995), is excused from the procedural bar of the statute of limitations under the miscarriage-of-justice exception. In order to make a showing of actual innocence under *Schlup*, a Petitioner must present new evidence showing that "it is more likely than not that no reasonable juror would have convicted [the petitioner.]" *McQuiggin*, 569 U.S. at 399 (quoting *Schlup*, 513 U.S. at 327) (addressing actual innocence as an exception to procedural default). Because actual innocence provides an exception to the statute of limitations rather than a basis for equitable tolling, a petitioner who can make a showing of actual innocence need not demonstrate reasonable diligence

in bringing his claim, though a court may consider the timing of the claim in determining the credibility of the evidence of actual innocence. *Id.* at 399–400.

### 1. Involuntary Intoxication

Petitioner claims that he was actually innocent of murder because he was involuntarily intoxicated when he shot the decedent. The Michigan Court of Appeals described the defense of involuntary intoxication as follows:

> This Court recently distinguished between a defense based upon involuntary intoxication caused by drugs and a defense based upon voluntary intoxication. In *People v. Wilkins*, 184 Mich. App. 443, 449, 459 N.W.2d 57 (1990), lv den 439 Mich 863 (1991), the panel held that the defense of involuntary intoxication is part of the defense of insanity when the chemical effects of drugs or alcohol render the defendant temporarily insane. As in any case in which the defendant interposes an insanity defense, it remains incumbent upon the defendant to demonstrate that the involuntary use of drugs created a state of mind equivalent to insanity. *Id.* 184 Mich. App. At 448–449, 459 N.W.2d 57. In contrast, an individual who is voluntarily intoxicated does not have grounds for an absolute defense based upon his insanity. See CJI2d 7.10; MCL. § 768.29a(1); M.S.A. § 28.1052(1)(1).
>
> Intoxication has been defined as a "disturbance of mental or physical capacities resulting from the introduction of any substance into the body." *People v. Low*, 732 P.2d 622, 627 (Colo. 1987).
>
> > Voluntary or self-induced intoxication is "caused by substances which the defendant knows or ought to know have the tendency to cause intoxication and which he knowingly introduced or allowed to be introduced into his body . . . ." Involuntary intoxication is intoxication that is not self-induced and by definition "occurs when the defendant does not knowingly ingest an intoxicating substance, or ingests a substance not known to be an intoxicant." [*Id.* Citations omitted.]
>
> The characterization of intoxication as either voluntary or involuntary depends upon the facts of each case. *Id.*
>
> Other jurisdictions have recognized that involuntary intoxication can be caused by the use of prescription medications. Such intoxication can constitute a complete defense if the defendant was unexpectedly intoxicated because of the ingestion of a medically prescribed drug. *Minneapolis v Altimus*, 306 Minn. 462, 469–470, 238 N.W.2d 851 (1976). In order to establish the intoxication is not voluntary, the defendant must not know or have reason to know that the prescribed

drug is likely to have the intoxicating effect. *Id*. at 470, 238 N.W.2d 851. Second, the prescribed drug, not another intoxicant, must have caused the defendant's intoxicated condition. *Id*. Third, the defendant must establish that as a result of the intoxicated condition, he was rendered temporarily insane. *Id*. Consequently, it is necessary to assess the effect of intoxication in conjunction with Michigan's test for insanity. See also *People v Turner*, 680 P2d 1290, 1292-1293 (Colo App1983) (discussion of effects of overdose of prescribed medication on whether the resulting intoxication was voluntary or involuntary). It was defendant's theory that he was rendered temporarily insane as a result of an involuntary intoxication caused by his use of prescription medication. Defendant presented sufficient evidence of his ingestion of Halcion in the period preceding the shooting, as well as expert testimony about its deleterious effects, to mandate the giving of instructions regarding this affirmative defense. Compare *Garza v State*, 829 S.W.2d 291 (Tex. App. 1992) (failure to instruct on involuntary intoxication caused by Prozac was not error where there was no evidence that the defendant consumed Prozac and that he was in the one percent of the population for which Prozac is believed to cause violent behavior). Compare also *Blaylock v State*, 600 So2d 1250, 1251 (Fla. App. 1992).

*People v. Caulley*, 494 N.W.2d 853, 858–59 (Mich. Ct. App. 1992) (alteration in original) (footnote omitted).[3]

Petitioner presents a statement of the underlying facts based upon the preliminary examination testimony. (Pet'r's Br., ECF No. 1-1, PageID.8–12; Pet'r's Reply, ECF No. 8, PageID.44–45.) Petitioner's father testified that on the night of November 2, 2016, he was sleeping and then he heard a shot. He testified that, when he awoke, Petitioner was standing next to him with a .22 rifle in his hand. Petitioner was naked, except for a pair of boots. Petitioner told his father that Petitioner had shot Timothy Shoemaker, the father's friend. Petitioner and his father

---

[3] The "involuntary intoxication" defense at issue in *Caulley* was different than the involuntary intoxication defense addressed in Mich. Comp. Laws § 768.37. That statute notes that voluntary consumption of a substance is not a defense to any crime, with one exception: "It is an affirmative defense to a specific intent crime, for which the defendant has the burden of proof by a preponderance of the evidence, that he or she voluntarily consumed a legally obtained and properly used medication or other substance and did not know and reasonably should not have known that he or she would become intoxicated or impaired." Mich. Comp. Laws § 768.37(2). This is also referred to as "the defense of involuntary intoxication." *See, e.g.*, *People v. Kersen*, No. 276766, 2008 WL 2038399, at *1 (Mich. Ct. App. May 13, 2008). That defense has no application here because second-degree murder is a general intent crime. *People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998).

went to the couch where the men had been watching the World Series earlier that night. Mr. Shoemaker was dead. Petitioner's father reported that he and Petitioner had been drinking Gatorade that night, and that Petitioner was not intoxicated. Petitioner's father also noted that Petitioner was upset and incoherent and not with it. Petitioner's father described another incident in September where Petitioner had some sort of episode and had been hospitalized.

Newaygo County Sheriff's Deputy Dylan Wimmer testified that he responded to the 911 call. He secured Petitioner in handcuffs. The deputy interviewed Petitioner. Petitioner told the deputy that he grabbed the rifle, walked up behind the victim, and pulled the trigger. The barrel was 2 or 3 inches away from the victim's head when Petitioner fired. The deputy acknowledged that Petitioner was cooperative, but that Petitioner made a statement to the deputy indicating that the deputy had done an excellent job at the baseball game and getting from the game to Petitioner's house. Petitioner also told another deputy that something told him to do it and that Petitioner may have been annoyed because the victim talked too much.

Newaygo County Sheriff's Department Detective Sergeant Adam Mercer testified that he interviewed Petitioner. Petitioner admitted shooting the victim in the back of the head with a .22 caliber rifle. After shooting the victim, Petitioner reported that the went to his father's bedroom and told him what happened.

Petitioner told Mercer his brain was scrambled and felt mushy. Petitioner also told Mercer about the incident in September. Petitioner had run out of his house naked then and did not remember what had happened later.

Trial counsel filed a notice of insanity defense.[4] The trial court ordered a forensic psychiatric examination. Petitioner was examined and the report indicated that Petitioner was competent to stand trial. A criminal responsibility report was also ordered, but Petitioner does not disclose the result. Trial counsel sought funding for a psychological expert and a toxicologist. The court granted that request and the defense disclosed the two witnesses—the toxicologist would testify about whether the Petitioner was intoxicated when the crime took place and the psychologist would testify about criminal responsibility.

A week before the scheduled trial, Petitioner entered a plea of guilty to second-degree murder and felony-firearm.

Petitioner's counsel also offers several additional facts:

- Trial counsel did not investigate or consider involuntary intoxication as a possible defense
- Petitioner was using a product called Rick Simpson Oil.
- Petitioner had obtained the oil from friends.
- The oil was a substitute for pain medications.
- Petitioner was using the oil on a daily basis for pain.
- The oil provided Petitioner relief from pain.
- Petitioner regularly used the oil with no bad effects.
- Rick Simpson Oil is not necessarily an intoxicant.
- Rick Simpson Oil has a high concentration of THC and it can cause acute intoxication in adults.[5]
- Petitioner had no reason to believe that his use of the oil would cause him to become intoxicated.
- Petitioner's use of the oil is a possible explanation for the September episode and the November shooting.
- There is no other rational explanation for why Petitioner would have shot the victim or acted the way he did after the shooting.

---

[4] The briefs also include details regarding the procedural history. (Pet'r's Br., ECF No. 1-1, PageID.12–16; Pet'r's Reply, ECF No. 8, PageID.7–8.)

[5] "'THC' stands for tetrahydrocannabinol, which is the primary intoxicant in marijuana." *United States v. Chappelle*, 735 F. App'x 644, 645 n.1 (11th Cir. 2018). "THC [is] the chemical which gives marijuana its intoxicating effect . . . ." *Chaney v. Southern Ry. Co*., 847 F.2d 718, 720 (11th Cir. 1988) (footnote omitted)

- Rick Simpson Oil is a non-prescription medication.

(Pet'r's Reply, ECF No. 8.) These facts are not supported by affidavit(s). Moreover, there is nothing in Petitioner's presentation to suggest that these facts are part of the lower court record. Petitioner's counsel simply states them in the brief. That is not evidence and, thus, Petitioner's claim of actual innocence, to the extent it depends on those facts, necessarily fails.

But even if Petitioner offered testimony or filed one or more affidavits in support of every factual allegation listed above, the Court would conclude that he has failed to meet the *Schlup* standard. Petitioner must demonstrate that it is more likely than not that no juror would have convicted him in light of the involuntary intoxication defense. He has not made that showing. Indeed, the facts he provides fall short of meeting that burden in several ways.

### 2.    Prescription Intoxicant

Petitioner acknowledges that the Rick Simpson Oil is a non-prescription medication. (Pet'r's Reply, ECF No. 8, PageID.59; *see id.*, PageID.46.) *Caulley* describes two different ways a person might become involuntarily intoxicated: "when the defendant does not knowingly ingest an intoxicating substance, or ingests a substance not known to be an intoxicant." *Caulley*, 494 N.W.2d at 859. Petitioner contends that he is innocent because he ingested a substance not known to be an intoxicant. But *Caulley* did not generically address every possible substance a person might ingest, it spoke only to "prescription medication." *Id.* (addressing Caulley's use of the prescribed drug Halcion).

Michigan's model criminal jury instruction likewise limits the application of the defense to a person becoming "unexpectedly intoxicated by the use of a prescribed drug." Mich. Crim. Jury Instr. 7.10(2). And every other Michigan appellate decision that suggests the involuntary intoxication defense might be applicable, is premised upon the defendant voluntarily taking **_prescribed_** medication that he did not know to be intoxicating. *People v. Hamilton*, No. 319980,

2017 WL 3316598, at *1 (Mich. Ct. App., Aug. 1, 2017) (addressing Hamilton's use of the prescription drug Adderall); *People v. Spurlock*, No. 326787, 2016 WL 5956060, at *1 (Mich. Ct. App. Oct. 13, 2016) (noting Spurlock's assertion of the defense based upon taking prescribed medications Ambien and Xanax); *People v. Smith*, No. 322283, 2015 WL 5952074, at *3 (Mich. Ct. App., Oct. 13, 2015) (addressing Smith's use of the prescribed drug clonazepam); *People v. Osborn*, No. 316228, 2014 WL 5364052, at *2–3 (Mich. Ct. App., Oct. 21, 2014) (foreclosing application of the defense where the drug, Klonopin, was prescribed for Osborn's wife *and* he had used her prescribed Klonopin before); *People v. Amparo*, No. 289955, 2010 WL 2594956 (Mich. Ct. App., Jun. 29, 2010) (addressing Amparo's claim that he was involuntarily intoxicated by injections of prescribed Toradol, Valium, and Dilaudid); *People v. Bernaiche*, No. 261498, 2008 WL 2627600 (Mich. Ct. App. Jul. 3, 2008) (addressing Bernaiche's claim that he was involuntarily intoxicated by his use of prescribed Prozac); *People v. Garrett*, No. 264384, 2007 WL 1828329, at *1 (Mich. Ct. App. Jun. 6, 2007) (addressing Garrett's ingestion of Prozac); *People v. Werner*, 659 N.W.2d 688, 693–94 (Mich. Ct. App. 2002) (addressing Werner's use of the prescription drug Tylenol 3); *People v. Parsons*, No. 188809, 1997 WL 33347802, at *1 (Mich. Ct. App. Nay 23, 1997) (addressing Parsons' use of prescribed insulin); *but see People v. Muehlhausen*, No. 183925, 1997 WL 33353596, at *1 (Mich. Ct. App. Mar. 7, 1997) (addressing Muehlhausen's inhalation of fumes while working as a painter). In every instance where the accused knowingly used alcohol or marijuana or other illicit drugs, the Michigan courts concluded that the involuntary intoxication defense was inapplicable.

Petitioner voluntarily took Rick Simpson Oil. Petitioner invites the Court to look to the internet to assess the nature of Rick Simpson Oil. Petitioner notes that "Rick Simpson Oil has a high concentration of THC and it can cause acute intoxication in adults. *E.g.*, www.uptodate.com/

cannabis-marijuana-acute.intoxication. This is only one of the publicly available Internet articles

on the substance." (Pet'r's Reply, ECF No. 8, PageID.46.)[6] WebMD echoes the information

Petitioner provides regarding Rick Simpson Oil:

> Rick Simpson Oil (RSO), an oil made from the flowers of the cannabis (marijuana) plant, gets attention online from people who claim it treats cancer. There's no solid evidence for it. But some early research suggests that some chemicals in marijuana have future potential as a cancer treatment.

> Cannabis oil comes in many types and formulations. These include cannabidiol (CBD) oil, which is often part of medical marijuana.

> Unlike many other cannabis oils, Rick Simpson Oil is high in tetrahydrocannabinol (THC), which is the main psychoactive chemical in marijuana. THC is the chemical in marijuana that provides the "high."

> Online reports say Simpson is a Canadian engineer and cannabis activist. After a bad fall, he found that marijuana helped lessen his dizziness and other symptoms. Later, when he developed basal cell skin cancers on his arm, Simpson used cannabis oil as a treatment. As the reports go, his skin cancers went away.

> **What Is Rick Simpson Oil?**

> RSO is an oil made by washing cannabis buds with a solvent, such as pure light naphtha, and then boiling off the solvent leaving behind the oil.

> RSO is not a branded product. That means there's no one "Rick Simpson Oil" for sale. On his website, Simpson explains how to make his namesake oil. But he does not sell a version of the oil for profit.

> Because RSO contains high levels of THC, it's illegal to buy in many places. But in states that have legalized marijuana -- either for personal use or for medical use -- you can find RSO at cannabis dispensaries.

---

[6] Petitioner also states:

> Had the defendant been allowed the hearings he had requested, he would have presented evidence about the Oil which would conform to the information publicly available. However, in the absence of those hearings, he is relying on the information publicly available.

(Pet'r's Reply, ECF No. 8, PageID.58–59.)

Markham Heid, *Rick Simpson Oil (RSO) for Cancer: Does It Work?* (May 16, 2022) https://www.webmd.com/cancer/rick-simpson-oil-for-cancer-overview (last visited Aug. 2, 2023).[7]

Rick Simpson Oil contains THC. Rick Simpson Oil is a controlled substance. *See* 21 U.S.C. § 802(16). It was not prescribed for Petitioner, he obtained it from friends. He took it to control pain. He took it regularly. On one occasion prior to the night Petitioner killed the victim, Petitioner had an episode of some sort where he behaved oddly, similar in some ways to his odd behavior the night of the killing. Petitioner attributes his odd behavior to his ingestion of Rick Simpson Oil.

Based on those facts—facts supplied by Petitioner—the Court concludes that a reasonable juror could—and likely would—determine that Petitioner voluntarily took a controlled substance

---

[7] *See also People v. Johnson*, No. 329742, 2018 WL 4577295, at *2 (Mich. Ct. App. Sept. 13, 2018) ("Defendant opined that the trimmings were unusable, but that they could be used to create "Rick Simpson oil," which he testified was given to his patients who had cancer."); *Hoover v. Mich. Dep't of Licensing and Regulatory Affairs*, No. 19-cv-11656, 2020 WL 230136, at *3 (E.D. Mich. Jan. 15, 2020) ("Plaintiff alleges that she suffers from Stage 4 cancer and that her doctor prescribed medical marihuana for her. (Compl. ¶¶ 7-8.) Plaintiff obtained a medical marihuana patient identification card from LARA. (*Id*. ¶ 7.) Her medical marijuana medicines include CBD/THC gummy cubes, THC extreme medicated pain balm, cannabis flower Sunshine Kush, Purple Punch Rick Simpson Oil, and specialty ribbon chews 200mg THC chill medicated lozenges. (*Id*. ¶ 9.) She alleges, however, that the supply of medical marihuana is insufficient because "[a] de minimus amount of grower, processor, transport, and testing facilities have been approved by LARA to operate under the MMFLA" and that a "lack of access to medical marijuana" has adversely affected her health. (*Id*. ¶¶ 10-12, 20.) Specifically, she contends that "LARA has only granted provisioning center licenses to 94 operations, grow licenses to 68 operations, processing licenses to 12 individuals, secure transporting licenses to seven operations, and testing licenses to only four safety compliance centers," which is "clearly insufficient to supply the tens of thousands of pounds [of] medical marijuana for the 300,000+ Michigan medical marijuana patients per month, leaving medical marijuana patients without a means to fulfill their medicinal needs." (*Id*. ¶¶ 27–28.) Plaintiff alleges that the lack of access to her medical marihuana regimen affects her health and well-being by failing to alleviate her pain, nausea, insomnia and decreased appetite from chemotherapy treatments. She claims that her health and quality of life are deteriorating. (*Id*. ¶¶ 8-11.)").

that was not prescribed for him. Under *Caulley* and its progeny, Petitioner would not be entitled to assert the "involuntary intoxication" defense.

### 3.     Reasonable Jurors

Even if Petitioner was eligible for the defense, the Court concludes that a reasonable juror could—and likely would—conclude that Petitioner took the Rick Simpson Oil knowing it was intoxicating because it relieved pain and because it was known to contain THC. Additionally, the Court concludes that a reasonable juror could—and likely would—conclude that Petitioner had reason to know of the intoxicating effects of the Rick Simpson Oil in light of the incident that occurred a couple of months before the killing. These determinations, based entirely on the facts Petitioner offers in support of his defense, deal critical blows to his involuntary intoxication defense.

Moreover, Petitioner offers other facts of record that further undercut his claims. Although Petitioner initially claimed at his plea that he did not remember the shooting, he remembered well enough the night of the incident. He told his father that he shot the victim; he told police that he shot the victim. And Petitioner's father testified that Petitioner was not intoxicated.

Finally, there are many facts that Petitioner has chosen to gloss over that might well run counter to his present claim. Petitioner's trial counsel hired a psychologist to testify regarding Petitioner's criminal responsibility the night of the incident and a toxicologist to testify regarding Petitioner's state of intoxication. Petitioner did not enter his plea until one week before the scheduled trial. The reports of these experts, if any, would certainly have been prepared by that date, but Petitioner does not even mention them, suggesting that they do not support Petitioner's present claim. If, on the other hand, the experts did not prepare any reports, that would leave only the report of the Center for Forensic Psychiatry regarding Petitioner's criminal responsibility, which did not favor Petitioner.

Petitioner suggests that his counsel (and perhaps the prosecution) only looked at the criminal responsibility issue in light of the standard definition of insanity, not in light of the involuntary intoxication defense. But the two are not so easily distinguished. Even if Petitioner could show that his ingestion of the Rick Simpson Oil was involuntary, it was intoxicating, and he was intoxicated, he would still have to show that the intoxication made him temporarily insane such that he could not distinguish between right and wrong and, thus, he should not be held criminally responsible for the killing. *Caulley*, 494 N.W.2d at 859 (stating "the defendant must establish that as a result of the intoxicated condition, he was rendered temporarily insane"); Mich. Comp. Laws § 768.21a. Whatever the cause of the insanity, the report of the Center for Forensic Psychiatry (and the report of Petitioner's expert, if any) would necessarily have addressed that issue.

In light of the facts Petitioner has presented, the Court finds that it is not more likely than not that no reasonable juror would have convicted Petitioner.

### 4. New Evidence

Moreover, a showing of actual innocence must be based on "new reliable evidence— whether it be exculpatory scientific evidence, trustworthy accounts, or critical physical evidence— that was not presented at trial." *Schlup*, 513 U.S. at 324. But the evidence Petitioner offers is not "new." All of the information he offers in support of his claim "would have been available to him at trial." *Connolly v. Howes*, 304 F. App'x 412, 418 (6th Cir. 2008).

### 5. Factual Innocence

Finally, it is not at all clear that Petitioner's argument leads to the conclusion that he was ***factually*** innocent. *See Bousley v. United States*, 523 U.S. 614, 624 (1998) (holding that "'actual innocence' means factual innocence . . ."). Petitioner characterizes the defense of involuntary

intoxication as an affirmative defense.[8] The Michigan courts, likewise, characterize involuntary intoxication as an affirmative defense. *See, e.g.*, *People v. Spears*, __ N.W.2d __, No. 357848, 2023 WL 3026944, at *9 (Mich. Ct. App., Apr. 20, 2023). "An affirmative defense admits the crime but seeks to excuse or justify its commission. It does not negate specific elements of the crime.'" *People v. Dupree*, 788 N.W.2d 399, 405 n.11 (Mich. 2010).

Conceptually, a criminal defendant who succeeds in establishing an affirmative defense is not "innocent," he is legally justified or legally excused.[9] That concept may lie at the heart of the Sixth Circuit's specific rejection of the argument that a petitioner's claim of innocence "because he was intoxicated when he shot the victim" demonstrates "factual innocence." *Spring v. Gray*, No. 22-3241, 2022 WL 16640878, at *5 (6th Cir. 2022).[10] Similarly, the Sixth Circuit has

---

[8] Petitioner also characterizes the defense of involuntary intoxication in a way that is directly contrary to the characterization that it is an affirmative defense: "[i]nvoluntary intoxication effectively negates the intent element." (Pet'r's Reply, ECF No. 8, PageID.46.) That which negates an element of the offense is not an affirmative defense. *Spears*, 2023 WL 3026944, at *9 (stating that "[o]ther defenses to murder, such as the defense of accident, are not affirmative defenses because they actually negate an element of the offense"). To approach the issue both ways is not inappropriate. The state courts have not been completely uniform in how they have described the defenses.

[9] The defense of involuntary intoxication would not "justify" a homicide; it would "excuse" it. The Michigan Supreme Court noted that where a criminal defendant established a common law defense that excused a homicide, the defendant was not innocent—he committed the felony but it was pardoned. *Pond v. People*, 8 Mich. 150, 178 (1860) (stating "excusable . . . homicide . . . at common law . . . was felonious, although pardoned . . . ."). But there are no clear paths on this journey. In *People v. Morrin*, 187 N.W.2d 434 (Mich. Ct. App. 1971), the Michigan Court of Appeals, relying on a stack of treatises, not Michigan case law, noted that "[t]here are two categories of innocent homicide; they are justifiable homicide and excusable homicide." *Id*. at 438 and n.4. The Michigan Supreme Court has never adopted *Morrin*'s categorization and, other than two other court of appeals opinions issued during 1971, neither has the Michigan Court of Appeals. *See People v. Schafer*, 193 N.W.2d 67 (Mich. Ct. App. 1971); *People v. Pepper*, 194 N.W. 67 (Mich. Ct. App. 1971).

[10] *See also Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000) ( "Mr. Beavers does not claim that he is innocent of killing Raymond Matthews. Rather, he claims that he is not guilty of first degree murder because he was intoxicated and acted in self defense. However, these arguments go to legal innocence, as opposed to factual innocence."); *Gaines v. Dowling*, 758 F. App'x 650, 653

18

consistently determined that defenses based on justification or excuse relate to legal innocence, not factual innocence. *See, e.g.*, *Fuller v. Morrison*, No. 21-2704, 2022 WL 2719644, at *2 (6th Cir. Mar. 25, 2022) (concluding that an attack on a conviction based on the petitioner's mental health diagnoses and their impact on intent did not amount to a claim of factual innocence); *Arellano v. Howard*, No. 21-1024, 2021 WL 5499487, at *4 (6th Cir. Aug. 23, 2021) (concluding that a petitioner's challenge to a conviction for shooting her husband under a claim of legal justification relates to "legal" innocence, not factual innocence); *Bushner v. Bracy*, 17-3553, 2017 WL 9480312, at *3 (6th Cir. Dec. 11, 2017) (concluding that a claim of self-defense—which is a claim of justification—"goes to [the petitioner's] legal, rather than factual, innocence"); *Stewart v. Harry*, 17-1494, 2017 WL 9249946, at *2 (6th Cir. Nov. 21, 2017) (concluding that it was beyond debate that a claim of innocence based on self-defense is a claim of legal innocence, not factual innocence); *Bacon v. Klee*, No. 15-2491, 2016 WL 7009108, at *8 (6th Cir. Nov. 30, 2016) (same); *Harvey v. Jones*, 179 F. App'x 294, 298–99 (6th Cir. 2006) (concluding that the petitioner's claim of justification rested upon legal innocence, not factual innocence and citing cases).

---

(10th Cir. 2018) (reaching the same conclusion as the *Beavers* court with regard to a claim of involuntary intoxication); *Clark v. Mays*, No. 2:18-cv-00103, 2020 WL 758809, at *4 (M.D. Tenn. 2020) (noting that under 6th Circuit authority, a claim of involuntary intoxication goes to legal innocence, not factual innocence); *Pulido v. Dorethy*, No. 12 C 7209, 2019 WL 5550583, at *3 (N.D. Ill. Oct. 28, 2019) (concluding that a claim of innocence based on involuntary intoxication might be "legal or technical innocence, but not actual innocence."); *Johnson v. Werholtz*, No. 07-3308-SAC, 2009 WL 248546, at *4 (D. Kan. Feb. 3, 2009) (stating that "Petitioner's claim that there was insufficient evidence of penetration and any suggestion that he was not guilty due to involuntary intoxication are clearly allegations of legal insufficiency, not factual innocence" (footnote omitted));*United States v. Antonelli*, No. 05 C 1195, 2006 WL 1049616, at *4 (N.D. Ill. Apr. 19, 2006) (stating "[e]ven if his theory of involuntary intoxication were sound, it would at best compute to legal innocence (i.e., he did what he is charged with doing but there is some reason why he should not be held legally responsible) rather than factual innocence (i.e., he did not do what he is charged with doing)").

### 6.    Summary

To sum up, for this Court to conclude that Petitioner is entitled to clear the barrier of the statute of limitations he must show that it is more likely than not that no reasonable juror would have convicted him. For the reasons stated above, the Court finds it unlikely that Petitioner's involuntary intoxication defense would have ever made it to the jury. But, even if the jury was instructed to consider the defense, based on Petitioner's showing, the Court can conclude no more than that Petitioner might have had a colorable argument. It is certainly possible that one or more jurors might have been swayed by Petitioner's argument; but the Court concludes that it is not probable that all of the jurors would have been swayed. That falls short of meeting the *Schlup* standard.

Moreover, even if the Court concluded that it is more likely than not that no reasonable juror would have convicted Petitioner because of involuntary intoxication, the Court concludes that it would demonstrate only "legal innocence" not "factual innocence." For all of these reasons, the Court concludes that Petitioner cannot overcome the tardy filing of his habeas petition. The petition is properly dismissed as untimely.

### E.    Certificate of Appealability

The Court must also determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.*

Petitioner's application is untimely and, thus, barred by the statute of limitations. Under *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), when a habeas petition is denied on procedural

grounds, a certificate of appealability may issue only "when the prisoner shows, at least, [1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Both showings must be made to warrant the grant of a certificate. *Id*.

Reasonable jurists could not find it debatable whether Petitioner's application was timely. It is several months late. Similarly, reasonable jurists could not find it debatable whether Petitioner has established his actual innocence such that his tardy filing might be overlooked. Therefore, a certificate of appealability will be denied. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court has conducted a preliminary review of the petition under Rule 4 of the Rules Governing § 2254 Cases. The Court finds, beyond dispute, that the petition is untimely; accordingly, the Court will enter an order denying a certificate of appealability and a judgment dismissing the petition with prejudice.

Dated:      August 9, 2023             /s/ Robert J. Jonker
                                      Robert J. Jonker
                                      United States District Judge